# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

BERWICK SOLAR, LLC and }
RUMFORD SOLAR, LLC, }
          }
       Plaintiffs, }
          }
v. }
          }
MAINE PUBLIC UTILITIES COMMISSION, }
PHILIP L. BARTLETT II, in his official capacity as }
Chairman of the Maine Public Utilities Commission, }
PATRICK SCULLY, in his official capacity as }
Commissioner of the Maine Public Utilities Commission, }
and }
CAROLYN GILBERT, in her official capacity as }
Commissioner of the Maine Public Utilities Commission, }
          }
       Defendants. }

## COMPLAINT

The Plaintiffs described in the caption above and identified below, by and through their undersigned attorneys, complain against the Maine Public Utilities Commission (the "PUC"); Philip L. Bartlett, II ("Chairman Bartlett"), in his official capacity as Chairman of the PUC; Patrick Scully ("Commissioner Scully"), in his official capacity as Commissioner of the PUC; and Carolyn Gilbert ("Commissioner Gilbert"), in her official capacity as Commissioner of the PUC (together, "Defendants") as follows.

## INTRODUCTION

1. Maine in 2019 enacted the "Act to Promote Solar and Distributed Generation Resources in Maine" (the "Solar Promotion Act") now codified at 35-A M.R.S. 3209-A and B, a climate remediation program which, as its title indicates, was intended to promote and incentivize

investment in new solar energy projects within Maine. The Solar Promotion Act thereby created a "net energy billing" program (the "NEB Program," codified at 35-A M.R.S. §§ 3209-A through 3209-I) in order to induce investment in renewable energy generation within Maine by allowing owners of "community solar" projects to recover project costs pursuant to long-term subscription contracts with residential, commercial, and industrial customers.

2.  In reliance upon and in response to Maine's promotional program, project sponsors and investors, including Plaintiffs, invested hundreds of millions of dollars to develop, construct, and operate commercial scale community solar projects to participate in Maine's NEB Program.

3.  The Plaintiffs each developed, financed and operate a community solar project to participate in the portion of NEB Program known as the "kWh Credit Program," 35-A M.R.S. § 3209-A, which allows individual customers to "subscribe" to a community solar project to receive a "kWh Credit" to be applied against the customer's metered volume electric consumption that, in turn, reduces the amount of energy for which it is billed by its electric distribution company ("EDC"). The customer receives a one-to-one kWh billing credit for each kWh of energy generated by its share of the solar project's energy output. The result is a saving for the customer equal to the otherwise applicable variable charges for the amount of the kWh Credits and a corresponding reduction in variable charge revenues otherwise payable to the applicable EDC.

4.  Although the reduction in those revenues is not an actual "cost" to the EDC systems, the Maine Public Utilities Commission ("MPUC") has nonetheless elected to treat the reduction as if it were a cost and allow the affected EDCs to recover the amounts of the resulting lost revenues (referred to as "Stranded Costs") through a "Stranded Cost Charge" assessed to all Maine ratepayers. Those Stranded Cost Charges provide revenues to the EDC in addition to the revenues allowed under the EDC's previously approved rate structures.

2

5.    As the NEB Program grew larger, however, the Maine legislature faced growing political pressure to reduce the amount of Stranded Cost Charges that the EDCs charge Maine's ratepayers.  In search of a political scapegoat, Maine's legislative leaders increasingly blamed and voiced discriminatory resentment and animosity towards the "out-of-state" owners and financiers of the NEB Program projects and sought to shift and reallocate millions of dollars of costs away from Maine ratepayers (and Maine voters) and onto the vilified and captive out-of-state interests that had invested in NEB Program projects.

6.  Those legislative efforts resulted in LD 1777, "An Act to Reduce Costs and Increase Customer Protections of the State's Net Energy Billing Programs," P.L. 2025, c. 480 ("LD 1777,") which amended the Solar Promotion Act and the NEB Program to renege upon Maine's investment incentives and, by  discriminatory intent and  design,  reallocate hundreds of millions of dollars of Stranded Costs away from Maine ratepayers and on to the out-of-state owners of solar projects, including those of the Plaintiffs,  that had made investments in reliance on the incentives of the NEB Program.

7.  LD 1777 will impose new and substantial fixed monthly charges upon community solar projects participating in the kWh Credit Program in order to reallocate costs away from Maine ratepayers and onto investors in those projects. The derivation of such charges was not based upon cost causation or program benefit and such charges are not supported by substantial evidence, economic analysis or expert testimony and, further, these charges were not subjected to cross-examination or the evidentiary procedures normally applicable to the setting of utility rates and charges.

8.    The discriminatory intent and effect of LD 1777 against out-of-state interests is demonstrated by its provisions imposing new charges on kWh Credit Program projects under out-

of-state ownership, but *exempting* similarly situated projects from those charges if (i) owned by the Maine customers receiving the kWh credits, or (iii) owned by a cooperative corporation organized under the laws of Maine. LD 1777, Sec. 9 ("Exceptions.") The preferential treatment based solely upon in-state Maine ownership is facially discriminatory, arbitrary and unrelated to the incurrence of Stranded Costs, which accrue on a uniform volumetric rate ($/kWh) based exclusively upon the subscriber's share of a project's actual energy production, a factor to which ownership structure is entirely irrelevant.

9.  Maine would, by the expressly discriminatory intent, design and effect of LD 1777, thereby extract economic value from captive out-of-state project investors and redirect that value to the State's own domestic interests. In so doing, LD 1777 violates the United States Constitution in at least five ways: (i) it violates the Equal Protection Clause of the Fourteenth Amendment; (ii) it violates the Commerce Clause of Article I, Section 8; (iii) it sets arbitrary and discriminatory charges that violate the Due Process Clause of the Fifth Amendment; (iv) it enacts an unconstitutional taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution; and (v) it impairs lawful contracts in violation of the Contracts Clause of the United States Constitution. The Court must not allow the offending elements of LD 1777 to stand.

## PARTIES

10.  Berwick Solar, LLC ("Berwick") is a Maine limited liability company the members and owners of which are not residents of Maine. Berwick developed, owns and operates a 2.5 MW solar facility in Bewick, Maine that commenced commercial operation in 2021. The Berwick project participates in the kWh Credit Program and is a party to Net Energy Billing Program Subscription Agreements with Maine retail customers for twenty (20) year terms. Berwick is party to an Interconnection Agreement with Central Maine Power Company ("CMP") pursuant to which

4

Berwick has paid all costs to the CMP system as a result of the project as determined by CMP. In reliance upon the incentives of the NEB Program, Berwick invested substantial equity and financed the project pursuant to a long-term third-party loan agreement with an out-of-state lender that is secured by the pledge of the project's revenues and assets. Berwick is prohibited by the terms of that loan agreement from ending its participation in the kWh Credit Program.

11. Rumford Solar, LLC ("Rumford") is a Maine limited liability company the members and owners of which are not residents of Maine. Rumford developed, owns and operates a 3.5MW solar facility in Rumford, Maine that commenced commercial operation in 2021. The Rumford project participates in the kWh Credit Program and is a party to Net Energy Billing Program Subscription Agreements with Maine retail customers for twenty (20) year terms. Rumford is party to an Interconnection Agreement with Central Maine Power Company ("CMP") pursuant to which Rumford has paid all costs to the CMP system as a result of the project as determined by CMP. In reliance upon the incentives of the NEB Program, Rumford invested substantial equity and financed the project pursuant to a long-term third-party loan agreement with an out-of-state lender that is secured by the pledge of the project's revenues and assets. Rumford is prohibited by the terms of that loan agreement from ending its participation in the kWh Credit Program.

## FACTS

### I.    Maine's NEB Program

**a.  The NEB Program has been dispositively determined to be a climate remediation measure that benefits society as a whole with its costs appropriately borne by all ratepayers.**

12. In 2019 Governor Janet T. Mills signed into law LD 91, "An Act to Eliminate Gross Metering." The law updated and reformed Maine's NEB Program and reversed Maine's previous policy of undervaluing clean energy generated by solar panel operators and supplied to Maine's

electrical grid.  The NEB Program's "kWh Credit Program," 35-A M.R.S. § 3209-A, is available to all customers of a Maine transmission and distribution utility and allows a subscriber to a community solar project to receive a one-to-one kWh credit against the amount of kWhs of consumption for which it would otherwise be billed by the interconnecting EDC, thereby reducing the associated variable charges based on kWh energy usage.  The subscriber receives an amount of kWh credits equal to its respective share of the project's actual kWhs of energy output for the respective billing period.

13.  In March 2025, the MPUC published a study analyzing the costs and benefits of the NEB Program and concluded that the benefits of the kWh Credit Program outweighed its costs. *See* Sustainable Energy Advantage, LLC (Prepared for Me. Pub. Util. Comm'n), Analysis of 2024 Net Benefits of Net Energy Billing Program (Mar. 31, 2025) at 32-33.[1]

14.  With specific reference to the kWh Credit Program, the study found that the societal benefits of the kWh Credit Program outweighed costs of the program by a ratio of 1 to 1:08 (Id. at 32), confirming that, in addition to their climate benefits, the citizens of Maine are economic beneficiaries of the kWh Credit Program.

15.  The MPUC had similarly confirmed in an adjudicatory proceeding that the NEB Program is a climate remediation measure that benefits all ratepayers and the public in general and that "basic rate design equity principles" thus dictate that the ratepayers should bear its costs: "[A]ll ratepayers benefit from the State's policies on climate change and beneficial electrification and, accordingly, basic rate design and equity principles would dictate that all ratepayers pay some portion of these costs."  Order No.  2021-00360, March 11, 2022, at 11.

---

[1] Maine-NEB-Y2024_CBA_Final.pdf

16.   In 2024 the Maine Supreme Court upheld the MPUC's conclusions that the NEB Program is a climate and environmental remediation program of which all of the ratepayers of Maine are the beneficiaries: "[T]he Commission explained that stranded costs are incurred not from the utilities' provision of T&D services, but for the Legislature's creation of energy programs...." and "[R]ecord evidence ... supports the position that the NEB programs have environmental benefits, that all ratepayers benefit from state policies on climate change, and that *there is no reason to deviate from how other policy costs are allocated*." <u>Industrial Consumers Grp. V. MPUC,</u> 320 A.23d 437, 447, n.7 (Me 2024)(emphasis added).

**b. Political pressure later prompted legislators to reallocate NEB Program costs away from Maine ratepayers and voters and on to out-of-state parties.**

17.   As the NEB Program grew, however, the Maine legislature faced growing political pressure to reduce the amount of such Stranded Cost Charges that the EDCs charged to Maine's native ratepayers[2] and thus sought to shift the burden of Maine's NEB Program in an arbitrary and discriminatory manner away from the program's beneficiaries, the ratepayers and voters of Maine, and onto the disfavored class of out-of-state project investors.

18. In search of a political scapegoat for the increasing Stranded Costs, Maine's legislative leaders, as described in detail below, increasingly and publicly targeted resentment and discriminatory animus towards the "out-of-state" interests that had invested in the NEB Program, including non-Maine project owners, non-Maine hedge funds, Wall Street investment firms, Goldman Sachs, and other "foreign companies and investors," and sought to reallocate hundreds

---

[2] (See, e.g., <u>Out-of-State Firms Reaping Windfall Profits on Maine's $220M Per Year Community Solar - Maine Local News</u> (May 30, 2023); <u>Community solar is booming in Maine, but who owns the projects?</u> Maine Monitor (July 21, 2024).

of millions of dollars of NEB Program costs to those targeted parties *because of* their non-resident status.

19. That discriminatory animus was plainly demonstrated during the 2025 legislative session by Maine's Senate Republican Leader Harold Stewart who submitted written comments to the Joint Standing Committee on Energy, Utilities and Technology of the Maine Legislature (the "Joint Energy Committee") in support of "An Act to Eliminate the Practice of Net Energy Billing" calling for the end of the NEB Program," which comments expressly targeted resentment against out-of-state interests that had invested under the NEB Program, claiming that the Program "only benefits solar developers, almost 90% of whom are out-of-state entities" and is "a government-backed scheme that goes to Hedge funds on Wall Street and to foreign companies and investors" and "preserves a program for an out-of-state solar company."[3]

20. Leader Stewart further stated express legislative animus and discriminatory intent in an additional written submission to the Joint Energy Committee of March 27, 2025 where he cast the targeted project owners as "greedy developers" that are "swiping" money from the public: "Buried in the T&D charges are millions and millions of dollars swiped from electricity users and mostly exported to out-of-state investors" in a "gold rush of greedy developers."[4]

21. Maine Senator Stacy Guerin, who also sponsored 2025 legislation to end the NEB Program, in an August 2024 statement expressed the same discriminatory animus against out-of-state interests in criticizing the NEB Program as "a program that clearly enriches out-of-state solar developers and sends millions to Wall Street investment firms," which she called an "unjust enrichment on the backs of Maine ratepayers" that "will certainly make many out-of-state solar

---

[3] Legislator's submission to the Joint Energy Committee (February 27, 2025) getTestimonyDoc.asp
[4] Legislator's submission to the Joint Energy Committee (March 27, 2025) getTestimonyDoc.asp

developers and their Wall Street bankers quite rich." [5]   In a February 27, 2025, written submittal to the Joint Energy Committee she again criticized the NEB Program and called for its repeal because "Wall Street and out-of-state developers benefit financially."[6]

22.  The sponsor of LD 1777, Rep. Sophie Warren, similarly objected to the NEB Program in a public statement because it benefited out-of-state financial interests that had invested in Maine solar projects: "I really believe ... that a majority of Mainers don't want to see us paying for projects out of our utility bills to corporations and private equity interests"  and that "I have due respect for Goldman Sachs, but I don't think we should be directing ratepayer money into their pockets."[7]

23.  As recorded in the Journal and Legislative Record of the Maine House of Representatives, Representative Warren in a legislative floor statement further stated her discriminatory animus and resentment that the NEB Program's benefits flowed to the wrong and disfavored parties, the out-of-state interests that had  invested in Maine: "Unfortunately, this well intended expansion [of the NEB Program] opened the door for out-of-state investors to rapidly develop projects across the state to benefit from these lucrative subsidies at the cost of Maine ratepayers," and that "money is flowing out of state to larger solar developers and investors, which is the very definition of regressive economic policy, in my view, respectfully."[8]

24.  At the same proceeding of the Maine House of Representatives Representative Paul in a legislative floor statement similarly targeted  discriminatory animus and resentment against both the out-of-state and international parties that had invested and participated in Maine solar projects under the incentives of the NEB Program: "And 87% of the NEB projects registered at the Maine PUC have out-of-State addresses" and "there's a lot [of out-of-state owners] that are not going to

---

[5] 'Job-killing solar tax' may be the tipping point for many Maine businesses – Maine Senate Republicans
[6] Legislator's submission to the Joint Energy Committee (February 27, 2025) getTestimonyDoc.asp
[7] Community solar is booming in Maine, but who owns the projects?  Maine Monitor (July 21, 2024)
[8]  Journal and Legislative Record of the Maine House of Representatives (June 23, 2023), p. 2.

benefit the State of Maine but Maine taxpayers are paying for them" and "some notable communities in here are Japan, New Zealand and Germany." Id.

25.   Maine's Office of the Public Advocate voiced similar concern in a reported public comment that the NEB Program benefitted disfavored out-of-state interests, as noted in the following press article: "[I]t's fair to say that the lion's share of the money will continue to flow out of the state of Maine to solar investment companies rather than remaining in Maine. 'They essentially saw the opportunity with the subsidy, there was a substantial opportunity to make a profit,' [Public Advocate Bill] Harwood said. 'And so a number of out-of-state investment funds are owning many of the about 1,000 projects that are either in operation or under development' [Harwood said.]"[9]

26.   The foregoing public statements confirm that the expressed objective of the Maine legislature was to reallocate hundreds of millions of dollars of the NEB Program costs away from Maine ratepayers (and Maine voters) and onto the disfavored and captive class of "out-of-state interests" by imposing new charges driven by resentment, discriminatory animus, irrational prejudice and in-state preference, factors that do not constitute or further legitimate state interests.

## II.      LD 1777 and its Arbitrary and Discriminatory Consequences

27. LD 1777 upended the NEB Program and reneged on its bargain with solar project investors and, through the assessment of new charges, reallocated millions of dollars in costs away from Maine ratepayers (and voters) and onto those project investors *because* they are "out-of-state" interests, a plain act of animus and resentment against out-of-state interests and discrimination in favor of in-state interests.  By changing fundamental aspects of both the Tariff Rate Program and the kWh Credit Program for existing projects, including those previously

---

[9]  Out-of-State Firms Reaping Windfall Profits on Maine's $220M Per Year Community Solar - Maine Local News (May 30, 2023).

structured under long-term financial arrangements, Maine reneged on its commitments that attracted investors in the Maine's solar projects and dramatically reallocated the costs of the NEB Program away from its in-state beneficiaries.

28.  The result of LD 1777 is an arbitrary and discriminatory reversal of the adjudicatory findings of the MPUC, which was based upon due process and record evidence, that the NEB Program is a  public program benefiting all ratepayers who should properly bear its costs, and the Maine Supreme Court's concurrence that  "[R]ecord evidence  ... supports  the position that the NEB programs have environmental benefits, that all ratepayers benefit from state policies on climate change, and that there is no reason to deviate from how other policy costs are allocated." Industrial Consumers GRP. V. MPUC, 320 A.23d 437, 447, n.7 (Me 2024).

29.  In marked contrast to the evidence-based conclusions of the MPUC and Maine Supreme Court, LD 1777 imposes new and entirely arbitrary charges with no evidentiary support or economic justification, no analysis of cost causation, and no demonstrated nexus and proportionality between program charges benefits.

30.  The facial discrimination against out-of-state interests is demonstrated by the provisions of LD 1777 that impose charges on kWh Credit Program projects generally, but exempt similarly situated projects from those charges if (i) owned by the Maine customers receiving the kWh Credits, or (iii) owned by a cooperative corporation if organized under the laws of Maine:

> **Net energy billing project charge**; applicability. Except as provided in subsection 5, the commission shall require a transmission and distribution utility to assess each distributed generation resource participating in net energy billing with a shared financial interest customer in accordance with section 3209-A, subsection 3.

***

> **5. Exceptions**. A distributed generation resource is exempt from the net energy billing project charge established in this section if the distributed generation resource demonstrates in a manner satisfactory to the commission that the distributed generation resource is:
>
> > **A.** Wholly owned by the customer or customers receiving the net energy billing credits associated with the output of the distributed generation resource; or
> >
> > **B.** Wholly owned by a cooperative corporation organized under Title 13, chapter 85 [of the Maine Revised Statutes].

LD 1777, Sec. 9(5).[10]  The preferential treatment based upon in-state Maine ownership is facially discriminatory, arbitrary and unrelated to the incurrence of Stranded Costs, which accrue on a uniform volumetric rate ($/kWh) based exclusively upon the subscriber's share of the project's actual energy production, a factor to which in-state ownership is entirely irrelevant.

31.  LD 1777's charges are further arbitrary in that different levels of charges are imposed based upon a project's nameplate capacity rating (i.e., its maximum potential) and not its actual production of energy.  The initial monthly charges are (i) $2.80 per kilowatt of nameplate capacity for projects with a capacity between 1 and 3 megawatts, and (ii) $6.00 per kilowatt of nameplate capacity for projects with a nameplate capacity between 3 and 5 megawatts, with provision for subsequent increases. See LD 1777, § 9.  The differential treatment based upon nameplate rating is arbitrary and unrelated to the incurrence of Stranded Costs, which accrue on a uniform volumetric rate ($/kWh) based exclusively upon the subscriber's share of the project's actual energy production, not its nameplate rating.

32. With respect to the Plaintiffs, Berwick 's 2.5 MW nameplate project would face new charges under LD 1777 of $84,000 per year ($2.8/KW/month x 2.5 MW x 12 months) while Rumford would face additional charges of $ 252,000 per year ($6.0/KW x 3.5 MW x 12 months).

---

[10] getPDF.asp, H.P. 1188 - L.D. 1777, Chapter 430 Public Law.

The grossly disproportionate impact of such costs relative to the likely kWh solar production amounts of those projects (and thus the resulting Stranded Cost amounts) demonstrates the arbitrary nature of the charges under LD 1777.

33. LD 1777 provides that these new kWh project charges are to be applied to "offset distribution costs associated with net energy billing arrangements that would otherwise be paid by ratepayers." LD 1777 § 9. Such charges, however, are fixed and payable to the interconnecting EDC even if the payments exceed the EDC's Stranded Costs or if the EDC has incurred no Stranded Costs, an irrational and arbitrary result that in those cases would lead to a double recovery of revenues by the EC.

34. The policy rationale for Stranded Cost Charges is that EDC rates were set based upon the EDC's allowed annual revenue requirement and its forecasted annual sales volume, resulting in $/kWh retail rates calculated to allow the EDC to earn that allowed annual revenue requirement under the assumed volume of sales. When a societal program like NEB reduces the EDC's actual invoiced sales below that forecasted sales volume resulting in "lost revenues," the EDC is made whole by recovering the corresponding amount of additional revenue through the Stranded Cost mechanism, whereby the revenue adjustment is "decoupled" from the EDC's traditional ratemaking process.[11] Under that rationale, there would thus be "lost revenues" to be recovered as Stranded Costs only if and to the extent that the NEB Program reduces the actually invoiced kWh sales volume below the volume of kWh sales that is assumed and reflected in the EDC's then current rates.

---

[11] The MPUC explained the incurrence of "lost revenues" and the compensatory adjustment to the EDC's revenues through the Stranded Cost Charge mechanism as follows: "[the NEB] program provides kWh credits to participating customers which reduce the amount of kWh for which the customer is billed, thereby reducing the bills of those customers, resulting in 'lost revenues'" that are recovered through Stranded Cost Charges that are determined "separate from the traditional ratemaking process." MPUC Order, Docket 2021-00360, March 21, 2022, at 1, 10.

35.  Such revenue adjustments decoupled from the traditional ratemaking process are thus typically applied only during the interim period between rate cases, when rates have not yet been "reset" and adjusted to reflect changes in the forecasted sales volume:  "It is worth remembering that the **decoupling affects revenue only between rate cases**: at the next rate case, the base rates are reset, using the mechanisms familiar to regulators in traditional cost of service regulation." Decoupling for Electric and Gas Utilities, National Association of Regulatory Utility Commissioners (the "NARUC Report"), at 7 (2007) (bold emphasis original).

36.  That distinction is particularly applicable now, where CMP has filed a general revenue rate proceeding in MPUC Docket No. 2025-00218 that would reset CMP's rates based upon an updated forecast of kWh sales volume that accounts for and reflects numerous factors, expressly including the expected amount of kWh Credits associated with the NEB Program. [12] *Thus, the proposed rates of CMP would be based upon a kWh volume that fully reflects the volumetric and revenue effects of the kWh Credit Program, so there would be no "lost revenues" under the new and reset rates and payment of LD 1777's charges would thus effect an arbitrary double recovery and unjust enrichment for the EDC.*

37.  LD 1777's application of substantial and arbitrary new charges to pre-existing projects, for which investments were made in response to Maine's incentives in effect at the time, contravenes fundamental American concepts of fairness and stability of governmental "encouragement" that is essential to supporting prudent investment, as set forth by the founding fathers in the Federalist Papers, No. 62 (27 February 1788):

> What farmer or manufacturer will lay himself out for the encouragement given to any particular cultivation or establishment, when he can have no assurance that his preparatory labors and advances will not render him a victim to an inconstant government? In a word no great improvement or laudable enterprise, can go

forward, which requires the auspices of a steady system of national policy.

38. The excessively burdensome new charges imposed by LD 1777 are entirely arbitrary and discriminatory against out-of-state interests and do not confer any new or corresponding benefit on the Plaintiffs or other participants in the kWh Program and there is no nexus or rough proportionality between the new kWh Program charges under LD 1777 and associated benefits.

## COUNT I

### VIOLATION OF THE EQUAL PROTECTION CLAUSE
### U.S. CONST. AMEND. XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201

39. Plaintiffs incorporate all of the foregoing allegations as if set forth fully here and incorporate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution providing that "nor shall any state deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

40. The Equal Protection Clause requires that a state's legislative classifications imposing differential burdens "must be rationally related to a legitimate governmental purpose" and that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446-450 (1985).

41. The Equal Protection Clause further requires that classifications imposing or exempting burdens on affected groups may not be based upon "irrational prejudice" and that objectives such as a "desire to harm a politically unpopular group are not legitimate state interests." Id. at 447, 450.

42. The Equal Protection Clause thereby enforces the requirement that state legislatures must act impartially with due consideration of harm to a disadvantaged class: "[L]egislatures have a 'duty to govern impartially,' and it is appropriate that the courts make some inquiry into whether

'an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class.'" Long Island Lighting Co. v. Cuomo, 666 F. Supp. 370, 421 (internal citations omitted), (N.D.N.Y 1987) (vacated in part on other grounds, 888 F.2d 230) ("Lilco").

43.  Courts exert a greater degree of rational basis scrutiny to challenges of state actions when brought under the Equal Protection Clause: "[I]t is appropriate that in making this inquiry, the courts should make a more searching rational basis analysis under the equal protection clause than would be made if the legislation at issue was challenged only under the substantive due process doctrine." Lilco, supra at 421.

44.  Such "more searching" judicial review recognizes that, as in this case, corrective resort to the democratic process is not a realistic alternative for unpopular minority parties targeted by legislative discrimination, as "[i]f the error only affects a minority singled out by the legislature, however, it is far less certain that the democratic process will remedy possible injustices, particularly when an unpopular minority is affected." Lilco, at 421.

45.  Federal courts have further clarified that "arbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review." Bankers Life and Cas. Co. v. Crenshaw, 486 U.S. 71, 83 (1988), and that when "legislative responses *unfairly* burden one or several like-situated individuals or groups, fundamental notions of justice and equality are offended," Lilco, at 418 (emphasis original).

46.  Under such standards LD 1777 violates the Equal Protection Clause because by intention, design and effect because it allocates burdens and exemptions to solar projects according to classifications that are arbitrary and that lack any rational relationship to a legitimate state interest, whereby new charges are assessed to the class of solar projects with out-of-state

16

ownership, but the class of projects (i) owned by the Maine customers receiving the kWh credits, or (ii) owned by a cooperative corporation organized under Maine law are exempt from those charges.  LD 1777, Sec. 9 (Exceptions).

47.  LD 1777's differential classification of projects based upon ownership violates the Equal Protection Clause because project ownership bears no rational relationship to the incurrence of Stranded Costs or thus to any legislative purpose regarding Stranded Costs, since as discussed above, Stranded Costs accrue on a uniform volumetric rate ($/kWh) based exclusively upon the subscribers' share  of  the solar project's actual energy production, a factor to which project ownership and domicile are  entirely irrelevant. There is also no rational basis to believe that the exempted class of projects with in-state ownership has any lesser causal connection to the incurrence of Stranded costs that could be a rational basis for the differential exemption under LD 1777.

48.  Under such standards LD 1777 further violates the Equal Protection Clause in that the reallocation of costs to the class of out-of-state interests owning solar projects is not rationally related to or advances the legislative purpose of the Solar Promotion Act, which is to remediate climate change by incentivizing investment in solar generation.  To the contrary, it is irrational to reallocate Program costs to the class of solar projects that actually remediates climate change, rather than to the class of fossil generators that contributes to climate change, or to the ratepayers who benefit from the remediation of climate change.  LD 1777 by such reallocation devalues and discourages investment in solar generation in a manner that does not rationally further, but affirmatively obstructs, the fundamental legislative purpose of the Solar Promotion Act.

49.  Under such standards LD 1777 further violates the Equal Protection Clause because the expressly stated purpose of legislators was to create the classifications of LD 1777 in order to

disadvantage and reallocate costs towards a politically unpopular group, the out-of-state project owners and investors, a patently discriminatory objective which is not and does not rationally further legitimate state interests and which violates fundamental notions of justice and equality.

50.    Under such standards LD 1777 violates the Equal Protection Clause because no impartial lawmaker could logically believe that the classification of out-of-state projects to bear the reallocation of Program costs, while projects with in-state ownership are exempted, serves a legitimate public purpose that transcends the harm to the members of the disadvantaged class.

51.    Under such standards LD 1777 violates the Equal Protection Clause in that the legislature plainly violated its duty to govern impartially and without animus, as confirmed by the key legislators' public statements noted above expressly confirming the intent to reallocate costs based upon animus and resentment against the class of out-of-state interests (characterized by legislative leadership as "greedy developers" "swiping" money from Maine citizens) and preference for in-state interests, an extraordinarily clear and well-documented case of arbitrary and irrational prejudice and impartial legislative classification.

52.    Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT II

## VIOLATION OF THE DORMANT COMMERCE CLAUSE
## U.S. CONST. ART. I, § 8, CL. 3

53.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein and incorporate the foregoing Dormant Commerce Clause of Article One of the United States Constitution. U.S. Const. Article One.

54.   The Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3, prohibits states from enacting laws or regulations that discriminate against or unduly burden interstate commerce.  The negative or "Dormant" Commerce Clause prohibits state policies that, whether facially or in purpose or effect, favor in-state economic interests over out-of-state participants.

55.   Courts apply strict scrutiny where legislation facially advantages in-state commercial interests or actors.  "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out of-state interests, we have generally struck down the statute without further inquiry." City of Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978); "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." Hughes v. Oklahoma, 441 U.S. 322, 337 (1979).

56.   As set forth above, LD 1777 by its terms discriminates facially against out-of-state interests by imposing charges on kWh Credit Program projects with out-of-state ownership, but exempting such charges for similarly situated projects if (i) owned by Maine customers receiving the kWh credits, or (ii) owned by a cooperative corporation organized under Maine law, a plain and facially discriminatory design and effect.  LD 1777, Sec. 9 (Exceptions).

57. The facially differential treatment based upon in-state Maine ownership is not rationally related to the incurrence of Stranded Costs, which accrue on a uniform volumetric rate ($/kWh) based exclusively upon the subscriber's share of the project's actual energy production, a factor to which ownership structure and domicile are entirely irrelevant.

58.  LD 1777's discriminatory purpose is expressly demonstrated by the public statements of Maine lawmakers repeatedly targeting out-of-state interests with animus and resentment and

demonstrating the intention to reallocate NEB Program costs to favor in-state economic interests and to the disadvantage of out-of-state interests.

59.  By targeting out-of-state entities by intention and design, LD 1777 directly affects and disrupts participation in the interstate and international transactions associated with the development, capital investment and ownership structuring of Maine's solar projects. The requisite sources of development and investment capital, tax equity, and project finance lending operate in competitive markets across state and national boundaries and, by the discriminatory reallocation of major costs to out-of-state projects, LD 1777 distorts and interferes with the interstate capital markets and radically affects the ability of and incentives for such entities to engage in the requisite interstate transactions.

60.  LD 1777's exemptions based upon Maine ownership also advantage in-state projects that do not pay the new charges and disadvantage projects with out-of-state ownership that must pay the new charges, giving the in-state projects a substantial operating cost advantage that allows them to offer greater subscriber discounts and thereby shift the competitive market balance for attracting subscribers to the detriment of out-of-state interests.

61.  LD 1777's exemptions based upon Maine ownership also advantage in-state projects that do not pay the new charges and disadvantage projects with out-of-state ownership that must pay the new charges, giving the in-state projects a substantial operating cost advantage that allows them offer renewable energy credits ("RECs") associated with solar production for sale in the New England regional and interstate trading market at  discounted prices and thereby shifts the competitive market balance in the multi-state REC market to the detriment of out-of-state interests.

62.  Maine cannot meet the requirements of strict scrutiny review under the Equal Protection Clause because it cannot show (i) a nondiscriminatory purpose (when it has reallocated

costs to certain project investors *because* they are out-of-state) or (ii) the absence of nondiscriminatory alternatives.

63. One such nondiscriminatory alternative was considered in the same legislative session as LD 1777: LD 839, "An Act to Lower Consumer Electricity Costs by Prohibiting the Recovery Through Rates of Costs Attributable to Net Energy Billing," which would fund Stranded Costs with general state revenues rather than through utility charges. In a legislative statement presenting the bill in the Maine Legislature, Senator Harold Stewart explained that it "would prevent transmission and distribution utilities from including certain net energy billing (NEB) program costs in their operating costs" and "[i]nstead, it would establish a dedicated fund to receive general fund appropriations to pay the NEB program costs…."[12] Under that alternative, Maine taxpayers, the beneficiaries of the program, would thus assume program costs on an entirely nondiscriminatory basis.

64. Another nondiscriminatory alternative would be for Maine to require its EDCs to file new proposed rates designed to recover the EDC's allowed annual revenue requirement based upon the currently forecasted volumes of kWh sales, with such forecasted volume reflecting all foreseeable volumetric additions and reductions, including any effect of the kWh Credit Program, so that there would be no "lost revenues" under the updated and reset rates and the EDCs would achieve their full revenue requirement in the absence of Stranded Cost Charges. See, the NARUC Report, cited above at par. 35.

65. The Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory relief, as well as to award attorneys' fees to persons aggrieved by a state's violations of the United States Constitution.

---

[12] Legislator's submission to the Joint Energy Committee (March 27, 2025) getTestimonyDoc.asp

## COUNT III

### THE UNLAWFUL EXERCISE OF POLICE POWERS VIOLATES DUE PROCESS RIGHTS
### U.S. CONST. AMEND. V, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201

66.  Plaintiffs incorporate all of the foregoing allegations as if set forth fully here and incorporate the Due Process Clause of the Fifth Amendment to the United States Constitution, as incorporated to the states by the Fourteenth Amendment, which provides: "[N]or shall private property be taken for public use, without just compensation. Nor shall any person … of …property without due process of law." U.S. Const. Amend. V.

67.  The setting of public utility rates and charges is an exercise of the state's police powers that violates the Fifth Amendment and is unconstitutional if the result is "arbitrary, discriminatory or demonstrably irrelevant to the policy of the legislature." In re Permian Basin Rate Cases, 390 U.S. 747 (1968), quoting Nebia v. People of New York, 291 U.S. 502, 539 (1934).

68.  As set forth above, LD 1777 imposes new kWh charges that are entirely arbitrary in that they are unexplained and unsupported by substantial evidence, any economic or cost basis or any analysis of a possible nexus or proportionality of the associated costs and benefits or any rational relation to a legitimate public policy.

69.  As set forth above, the kWh charges under LD 1777 are demonstrably arbitrary and discriminatory in that the applicability of, and exemption from, those charges is based, by intention and design, upon in-state versus out-of-state ownership, a factor unrelated to the incurrence of Stranded Costs, which arise volumetrically on a uniform $/kWh basis according only to the subscriber's share of the project's actual kWhs of production, an amount  to which the project's in-state ownership is entirely irrelevant.

70.  As set forth above, the kWh charges under LD 1777 are demonstrably arbitrary in that differential rate treatment is based upon nameplate ratings, a factor that is totally unrelated to the incurrence of Stranded Costs, which arise volumetrically on a uniform $/kWh basis according only to the subscriber's share of the project's actual kWhs of production, an amount to which the project's nameplate rating is entirely irrelevant.

71.  As forth above and discussed in the NARUC Report, the kWh charges under LD 1777 are demonstrably arbitrary in that the amounts are fixed and payable to the interconnecting EDC even if the payments exceed the EDC's Stranded Costs or if the EDC has incurred no Stranded Costs, including where the interconnecting EDC's then-current rates have been reset based upon a presumed kWh volume that fully reflects the effects of the NEB Credit Program, in which case there would be no Stranded Costs and the payment of LD 1777's charges would arbitrarily effect a double recovery and unjust enrichment for the EDC.  See, the NARUC Report, cited above at par. 35.

72. As set forth above, the result of LD 1777 is arbitrary in that it imposes arbitrary and discriminatory charges on non-resident investors and constitutes an unreasonable reversal of the adjudicatory findings of the MPUC, based upon due process and record evidence, that the NEB Program is a public program benefiting all ratepayers who should thus properly bear its costs.

73. As set forth above, the result of LD 1777 is arbitrary in that it is an unreasoned reversal of the Maine Supreme Court's concurrence with the adjudicatory findings of the MPUC that all ratepayers benefit from its stated policies on climate change and that there is no reason to deviate from the prior allocation of Stranded Costs.  Industrial Consumers GRP. V. MPUC, 320 A.2 3d 437, 447, n.7 (Me 2024).

74. The kWh charges under LD 1777 are also demonstrably arbitrary as a contravention of the "fundamental objective in utility ratemaking … that customers who benefit from a service should bear the cost of providing that service." Maine Water Co. v. Pub. Utilities Comm'n, 482 A.2d 443 (Me 1984); New England Tel. & Tel. Co. v. Pub. Utilities Comm'n, 470 A. 772 (Me 1984)("[I]t is important that the costs and benefits of services should be distributed over time so that, as nearly as possible, the same ratepayers who ae charged for a service will receive the benefit thereof.")

75. As set forth above, LD 1777 is discriminatory in that the stated legislative objective was to reallocate costs away from Maine ratepayers (and Maine voters) and on to project investors, _because of_ their out-of-state status,  while exempting similarly situated projects on the basis of Maine ownership, a blatantly discriminatory objective and result confirmed by public statements and facially discriminatory provisions that make this an extraordinarily clear instance of arbitrary and impermissible discrimination based upon animus against out-of-state interests and discriminatory preference for in-state interests.

76. Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory relief, as well as to award attorneys' fees to persons aggrieved by a state's violations of the United States Constitution.

## COUNT IV

## PER SE TAKING IN VIOLATION OF THE FIFTH AMENDMENT
## U.S. CONST. AMEND. V, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201

77. Plaintiffs incorporate all of the foregoing allegations as if set forth fully herein and incorporate the foregoing Takings Clause of the Fifth Amendment of the United States Constitution. U.S. Const. Article one.

78.   The Takings Clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V.  The Fifth Amendment creates a constitutional right to just compensation when the government takes a person's property for public use.

79.   With specific reference to societal initiatives like the NEB Program that benefit the public generally, "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

80. It is a violation of the United States Constitution for the government to condition a person's receipt of a benefit on that person's relinquishment of a constitutional right. See Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 604, 614 (2013).

81. In the context of the Fifth Amendment, where the government demands a monetary payment that burdens a person's interest in specific property, the demand constitutes an unconstitutional taking unless the government can prove a 'nexus' and 'rough proportionality' between the government's monetary demand and the ills sought to be addressed by the demand.

82. The new LD 1777 charges on kWh Credit Program projects is a non-tax monetary extraction tied to the Plaintiffs' use of their real property, because it is based on the characteristics of the solar facilities physically attached to those real property parcels. The project charge thus burdens the Plaintiffs' interests in specific parcels of land, such that the project charge would constitute a taking if it were directly required by the government.

83. Defendants cannot establish an adequate nexus between the new LD 1777 charges and the purported societal ills LD 1777 seeks to address.  As set forth above, while the project charge

purports to address Stranded Costs associated with the NEB Program that are otherwise paid by ratepayers, the project charge is not linked to the Plaintiffs' actual energy generation, and therefore is not linked to the incurrence of Stranded Costs that it purports to address, which is based entirely on actual energy production.

84.   The new LD 1777 charges on kWh Credit Program projects are also not roughly proportional to the impact of the Program's costs, as demonstrated by the findings of the MPUC and its commissioned study discussed above confirming that the benefits of the kWh Credit Program to all ratepayers outweigh the costs of the program, even in the absence of the project charge.

85. The new charges therefore constitute a taking of private property for public use without just compensation, as prohibited by the Fifth Amendment.

86. In addition, the Takings Clause of the U.S. Constitution prohibits the government from appropriating a person's private property, including money, when that appropriation is not lawfully imposed as a tax or fee.

87. The project charge is not reasonable because it is not imposed for the reimbursement of the cost of any benefit provided to the Plaintiffs through the kWh Credit Program.

88. The new project charge therefore constitutes a taking of private property for public use without just compensation, as prohibited by the Fifth Amendment.

89. The Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

26

## COUNT V

## REGULATORY TAKING IN VIOLATION OF THE FIFTH AMENDMENT
## U.S. CONST. AMEND. V, XIV; 42 U.S.C. 1983; 28 U.S.C. § 2201

90.   Plaintiffs incorporate all of the foregoing allegations as if set forth fully herein and incorporate the foregoing Takings Clause of the Fifth Amendment of the United States Constitution. U.S. Const. Article one.

91.   The Takings Clause also prohibits as a regulatory taking a regulation that so restricts a person's property that justice and fairness require that compensation be given.

92.   To assess whether a regulatory taking has occurred, the Court must make three inquiries: "(1) what is the economic impact of the regulation; (2) [does] the government action interfere with reasonable investment-backed expectations; and (3) what is the character of the government action." Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002) (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978)).

93.   As noted above, the economic impact of LD 1777's proposed changes to the kWh Credit Program and to the Plaintiffs is highly burdensome.

94.   LD 1777 interferes with reasonable investment backed expectations. Plaintiffs invested and obtained financing with the reasonable expectation of the Program's incentive structure for the term of the long-term financing and the twenty (20) year terms of their Net Energy Billing Program Subscription Agreements.

95.   The character of LD 1777 is a requirement that the project investors must bear costs of a societal climate remediation program that benefits the public at large and is akin to a physical taking, because the government is essentially devaluing the electrons, themselves physical property, generated by the regulated DGRs.  Additionally, LD 1777's project charge is tied to the

Plaintiffs' use of their real property based on the characteristics of the solar facilities physically attached to those real property parcels.

96.  LD 1777's proposed changes to the kWh Credit Program therefore constitute an unconstitutional regulatory taking of private property for public use without just compensation.

97.  Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

**COUNT VI**

**VIOLATION OF THE CONTRACT CLAUSE**
**U.S. CONST. ART. 1, SEC. 10; 42 U.S.C. § 1983; 28 U.S.C. § 2201**

98.  Plaintiffs incorporate all of the foregoing allegations as if set forth fully herein and the foregoing Contract Clause of the United States Constitution.

100.  The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Contract Clause "limits the power of the States to modify their own contracts as well as to regulate those between private parties." United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 17 (1977).

101.  A two-step test governs whether a State has violated the Contract Clause. The first question is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978). The second question is whether the "[l]egislation adjusting the rights and responsibilities of contracting parties" is based "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." United States Trust Co., 431 U.S. at 22.

103.  Plaintiffs have net energy billing agreements with utilities and Net Energy Billing Program Subscription Agreements with customers with twenty-year terms.

104. LD 1777 substantially impairs Plaintiffs' contractual arrangements by "undermin[ing] [Plaintiffs'] contractual bargains, interfer[ing] with [Plaintiffs'] reasonable expectations, and prevent[ing] [Plaintiffs] from safeguarding or reinstating [their] rights." Sveen v. Melin, 584 U.S. 811, 819 (2018).

105.    As to the Plaintiffs, LD 1777 "imposes a completely unexpected liability in potentially disabling amounts" for Plaintiffs.  Allied Structural Steel Co., 438 U.S. at 247. The Plaintiffs entered into long-term financing agreements based on the reasonable expectation that the NEB Program would allow them to participate in the kWh Credit Program without a fundamental reallocation of its economic benefit and therefore LD 1777 impairs the Plaintiffs' contractual rights and benefits.

106. As set forth above, LD 1777 furthers no legitimate and nondiscriminatory legislative purpose that could justify the drastic impairment of contractual obligations that LD 1777 inflicts.

107. LD 1777 therefore violates the Contract Clause by substantially and unreasonably impairing Plaintiffs' contractual relationships.

108. The Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

WHEREFORE, Plaintiffs pray the Court:

A. Enter judgment for the Plaintiffs on Count I, and declare LD 1777's project charge for kWh Credit Projects an unconstitutionally arbitrary and discriminatory exercise of the State's Police Powers that violates the Fifth Amendment to the United States Constitution;

B. Enter judgment for the Plaintiffs on Count I, and declare LD 1777's project charges for kWh Credit Project an unconstitutional violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

C. Enter judgment for the Plaintiffs on Count II, and declare LD 1777's project charges for kWh Credit Project an unconstitutional violation of the Commerce Clause of the Fourteenth Amendment to the United States Constitution;

D. Enter judgment for the Plaintiffs on Count III, and declare LD 1777's project charge for kWh Credit Projects an unconstitutionally arbitrary and discriminatory exercise of the State's Police Powers that violates the Fifth Amendment to the United States Constitution;

E. Enter judgment for the Plaintiffs on Count IV, and declare that LD 1777 violates the Takings Clause of the Fifth Amendment to the United States Constitution;

F. Enter judgment for the Plaintiffs on Count V, and declare that LD 1777 violates the Takings Clause of the Fifth Amendment to the United States Constitution;

G. Enter judgment for the Plaintiffs on Count VI, and declare that LD violates the Contracts Clause of the Fourteenth Amendment to the United States Constitution;

H. Award Plaintiffs their reasonable attorneys' fees, in accordance with 42 U.S.C. §§ 1983 and 1988(b); and

I. Award Plaintiffs any such other relief the Court deems just and appropriate.


Dated: January 13, 2026         /s/Edward W. Gould ~ Maine Bar No. 2603
                                Gross, Minsky & Mogul, P.A.
                                P.O. Box 917
                                Bangor, ME 04402-0917
                                Tel: (207) 942-4644
                                ewgould@grossminsky.com

                                *Attorneys for Plaintiffs*